JOHN MARTIN *v.* JOHN O'BRIEN et al.

1. SHIELDSBOROUGH: ACT OF INCORPORATION CONSTRUED.—The 14th section of the Act of 1854, incorporating the town of Shieldsborough, confers the power on the corporate authorities of the town to grant to the owner of a licensed public wharf, the exclusive right to erect and keep such a wharf within the limits of the corporation.

2. STATUTES: CONSTRUCTION OF.—A statute should not receive such a construction as would render any of its provisions vain and useless.

3. CONSTITUTION: STATE MAY GRANT EXCLUSIVE RIGHT TO KEEP A WHARF.—The first section of Art. I of the Constitution of the State, declares "that no man or set of men are entitled to exclusive, separate, public emoluments or privileges from the community, but in consideration of public services;" but this does not prohibit the legislature from granting to a single individual or association the exclusive right to erect and keep a public toll wharf, within certain prescribed limits, for such an improvement being beneficial to the public, in order to secure its erection, the exclusive profits thereof may be granted to the contractor, and moreover the grant is presumed to be in consideration of public services and for value. (See 3 Kent Com. 458; *Charles River Bridge* v. *Warren Bridge*, 11 Peters, 420; 15 John. R. 387.)

4. JURISDICTION: SEA-SHORE.—The jurisdiction of the State extends as far out into the sea as may be necessary for the public safety and the undisturbed use of the adjacent shore.

5. SEA-SHORE: RIGHTS OF ADJACENT PROPRIETORS.—The right of the owner of land bounded by the sea extends only to high-water mark; all the shores below high water belong to the State, as trustee, for the benefit of the public, or may, by grant, become private property, or the subject of an exclusive private right, and hence it is no violation of the right of such owners for the State to grant the exclusive privilege to an individual to erect and keep a public wharf on the sea-shore adjoining their lands.

6. CONTRACT: CONSIDERATION: FRANCHISE GRANTED ON VALUABLE CONSIDERATION CANNOT BE REVOKED.—M. was the owner of a public wharf in the town of S., under a license from and contract with, the corporate authorities thereof, by which he was bound to keep the same in repair until the year 1861. In November, A. D. 1855, his wharf was destroyed by a storm, and thereupon he procured a new license, for which he paid $25, and made a new contract, by which he was authorized and bound to build another wharf, and to keep the same in repair until the year 1866; and, in consideration thereof, the exclusive right to keep a public wharf on the shores of the town, and receive tolls therefor, was granted to him for the period aforesaid. *Held*, that the contract was supported by a valuable consideration; that his exclusive right to erect and keep a wharf secured by it, could not be impaired by the grant of a license for the erection of another public wharf contrary to the terms of the contract.

7. CHANCERY: WHAT JUDGE MAY DISSOLVE INJUNCTION.—After an injunction has been granted and the bill filed, the judge of another district than the one in which the suit is pending cannot make an order modifying or dissolving the injunction.

8. SAME: NEW BILL NOT ALLOWABLE TO DISSOLVE INJUNCTION.—The defendant to an injunction-bill cannot procure a dissolution of the injunction by filing a new bill against the complainant; and, if such a bill be filed, it will be irregular, and should be dismissed.

IN error from the Chancery Court of Hancock county. Hon. William M. Hancock, Chancellor.

*W. P. Harris,* for appellant.

There is no common right to erect a toll bridge, or wharf, or ferry, on a public navigable stream, or on the sea-shore: 3 Paige, 313; 3 Kent, 427; or even a free bridge or wharf in the limits of an exclusive grant. 1 Johns. Ch. R. 611; 4 Ib. 173; 5 Ib. 100.

It is a franchise which the government alone can grant, either directly by the legislature, or by or through agencies appointed and authorized by the government.

By this means it is in the power of the government to grant the franchise on the terms which in the opinion of the government are best adapted to the end to be attained, to wit, the public utility. It may be exclusive, within prescribed limits as to time and locality. The government, in performing its obligations to provide for the public welfare and convenience, is at liberty to consult the best means of promoting these objects, and may enlist private enterprise in the construction of public works on such terms as may seem best, and may, as an inducement, grant exclusive privileges or rights to individuals. This does not conflict with the Constitution.

The question of power to grant exclusive rights in respect to franchises is no longer debatable. The State may surrender for a stated time, or within a prescribed locality, its power to grant like franchises to others in favor of the grantee of a franchise. It may surrender the right to tax particular property. *State Bank of Ohio* v. *Knoop,* 16 How. U. S. 369; 27 Miss. 209.

There must, however, be clear and unquestionable evidence of an intention to part with such power, contained in the law or grant by which it is claimed to have been surrendered. *Charles River Bridge* v. *Warren Bridge,* 11 Peters, 420.

The material inquiry therefore in this case is limited to the construction of the 14th section of the act of incorporation of the city of Shieldsborough, passed in 1854, and to the ordinance of the corporate authority of that city, under which the appellant, Martin, claims the exclusive right to erect a public toll wharf within the limits of that city.

It is not questioned that the ordinance or grant from the city in express terms gives the exclusive right for a term of years to the complainant, Martin, to erect a toll wharf within the limits of the city of Shieldsborough, as fixed by the charter of 1854, and conse-

quently there remains but the single question, whether the 14th section of that charter authorized the city government to make the grant.

See record 13 for the 6th section of the ordinance of 1855, granting to John Martin the exclusive right to erect a public toll wharf.

The 14th section of the act of incorporation of the city of Shieldsborough—Acts of 1854, page 499—provided that the city government " shall have power to grant licenses for the erection and keeping of wharves, &c., *to all persons applying for the same, for such time and under such rules and restrictions, and with such privileges exclusive, or others, as they may think proper.*" The section further gives power to punish by fine, persons who shall erect wharves and receive compensation for landing and shipping goods, &c., without license, as therein provided.

The question is one of construction only. There is no attempt to derive power or right as against the public by implication from a grant. The court is called upon to settle the meaning of certain *express words.*

The construction contended for on the part of the appellees is, that by giving power to the city government to grant licenses *to all persons applying,* the power to grant the right to keep a toll wharf to one person, to the exclusion of all others, defeats the purpose of the act, which was to confer *the right on all persons* to obtain such licenses, and therefore the word " exclusive" must be confined in its meaning, to the right to take tolls on the particular wharf licensed, to the exclusion of all interference on that particular wharf. In other words, that no persons, other than the grantee of the license, shall be allowed to take tolls for goods landed or shipped at that particular wharf; that, consequently, exclusive privilege does not mean the exclusive right to keep a toll wharf within prescribed limits.

This construction is not even plausible. It is founded on an erroneous view of the object of the section, and upon a proposition of law which has no support from any decision, or from any general principle.

The object of the 14th section was not to confer *rights on individuals or on mankind at large,* but to confer *power on a govern-*

*ment.* There was no common right to erect toll wharves before the act; that was a franchise which could be exercised only by permission of the State. The rights of individuals were not added to by the charter, nor was there any purpose to enlarge the privileges of citizens. When, therefore, the act declares that the city government shall have power to grant licenses, &c., to all *persons*, there was no design to confer upon all persons the *right to keep toll wharves.* It is not declared to be the *duty* of the city government to grant licenses to all persons, nor is the power given in order that *all persons* may keep toll wharves. It was the purpose of the charter to confer upon the local government of a city, within prescribed limits, the power which the State government had over the same subject. The State has power to grant to all persons applying for licenses to keep ferries, bridges, wharves, &c., but is not bound to grant them to all persons.

The meaning of the words "exclusive privileges" therefore cannot be confined on any *notion* that there was a purpose in the legislature to enlarge the rights of individuals, or to make the privilege of keeping toll wharves in the city of Shieldsborough *universal.* There is a prohibition of the exercise of the franchise, except upon such terms and under such rules and restrictions as the city government may see proper to prescribe; thus keeping up the idea that it is a public franchise, belonging to the public in due *organized form* only.

When a license is granted to a particular person to exercise a public franchise, it is necessarily exclusive of all other persons as to the particular bridge, ferry, or wharf owned by him, and used as a toll bridge or wharf, whether such other persons have obtained license or not. Every grocery keeper, who obtains a license to retail vinous and spirituous liquors, has the *exclusive privilege* of retailing his own liquor, and every licensed keeper of a billiard table has the exclusive right to use his own table, and to the receipt of the fees for the use of it. This sort of exclusive privilege is from necessity conferred in every grant from the government. The position, therefore, that "exclusive privileges" in the section was intended to mean that *each licensed wharfinger* should have the exclusive right to *take toll for landing and shipping goods on his own particular wharf,* does not seem to be well founded.

The subject-matter of the section, the language employed, and the general purpose, all seem to indicate clearly that full power and discretion were designed to be given to the corporation to legislate upon and control the whole subject, limited only by the constitution and general laws of the State. It was deemed to be important, in order to secure at all times a safe and convenient means of landing and shipping goods, passengers, &c., that some sufficient inducement should be held out in order to enlist private enterprise and capital in the erection and keeping of a wharf for public convenience. Exclusive privileges to prevent competition, which might deter responsible persons from the undertaking, is known to be one of the inducements ordinarily held out by the government in such cases. That it was so understood by the legislature there cannot be a doubt; and that in conferring the power on the city government to grant exclusive privileges, in connection with licensing wharves, it is equally clear that the legislature meant to use the word "exclusive" as applicable to the exclusion of other persons from like privileges for a term of time and within particular limits.

The corporation having exercised the power and discretion conferred to it, the question as to the wisdom or justice of the measure which they saw fit to adopt, is not before this court.

The decision of the judge of the Hancock Circuit Court has nothing to rest upon but the position that the grant to Martin was invalid, and that, we think, is untenable.

The city had no right to resume the grant, nor by any ordinance to violate the contract with Martin. The sovereign power may resume a franchise, or destroy it for the use of the public, but must make compensation, and, until compensation is made, the party had a right to enjoin the infringement of his rights under the grant. See 17 Connecticut, 40 (Leading Case).

*John Henderson* and *W. A. Champlin*, on same side, filed an elaborate brief, in which they made the following points:—

1. The State had constitutional power to confer the franchise claimed by Martin. 3 Ark. 595; 3 Kent, 458; 15 John. R. 387; 3 Paige, 313; *Williams* v. *Carmack*, 27 Miss. 209.

2. The shores of the sea, between low and high-water mark,

belong to the public. 3 Kent, 4, 27; 17 Wend. 571; 5 La. R. 132; 18 Ib. 122.

3. Martin having acquired the franchise from competent authority, cannot be deprived of it; nor can his rights vested under it be impaired. 3 Kent, 458; 3 Cranch, 1; 2 Peters, 611; 4 Cranch, 333; 4 Peters, 514; 4 Wheat. 628; 7 Cranch, 164; 9 Ib. 43; 9 Wend. 351; 11 Peters, 257; 17 Conn. 40; 8 Wheat. 464; 1 Ala. R. 23; 2 Stewart's R. 30; 5 Harris, 503; 2 Mod. 317; 6 East, 602; 8 Ib. 310.

4. The proceedings had before Judge Yerger were unprecedented and without warrant of law. It was a clear usurpation of power on his part to order the injunction modified; the cause was then pending in a court in which he had no right to preside.

5. The bills and petitions filed by defendants were irregular, and should have been stricken from the files.

*R. N. Ogden* and *Yerger* and *Anderson*, for appellee.

HANDY, J., delivered the opinion of the court.

This was a bill filed by the appellant in the Chancery Court of Hancock county, enjoining the appellees from the erection and establishment of a wharf upon the sea-coast, at the town of Shieldsborough, in this State, alleged to be an infringement of an exclusive privilege granted to the appellant. The appellant's right is set forth in the bill substantially as follows:—

That by various acts of the legislature, the town of Shieldsborough was incorporated, and by the Act of 1848, its limits were enlarged to the extent of about five miles along the coast, and the municipal authorities of the town were empowered to grant licenses within its corporate limits for the erection of wharves, for such length of time, under such regulations, and upon such terms as they might think fit, which act was repealed by the Act of 1850, and a new act then passed conferring upon the corporate authorities the same powers in relation to wharves as the Act of 1848; that on the 1st March, 1854, a new act of incorporation was passed, incorporating the town as a city, and providing for its municipal government and officers to consist of a mayor and aldermen, having jurisdiction over the same territory as was embraced in the preceding acts; and

by the 14th section of that charter, the mayor and aldermen were empowered " to grant licenses for the erection and keeping wharves, for the landing or shipping of any goods, &c., for such time, and under such rules and restrictions, and with such privileges, exclusive or others (otherwise), as they might think proper; and to establish the rates of wharfage, to be collected by the wharfinger, and to impose a fine, not exceeding fifty dollars, for every violation of the act, upon any person or persons who shall keep a wharf for the landing and shipping of any goods, &c., and directly or indirectly demand, take, or receive any compensation therefor, without having previously obtained a license, as herein provided; that, under these various acts of incorporation, the appellant—from the year 1846 to the time of filing the bill—had been the proprietor of a public wharf at the town, under licenses from the corporate authorities, it being the only public and licensed wharf there, and it having answered all the wants of the town in that respect, and that he continued to exercise the exclusive privilege of keeping a wharf there, under license from the authorities, until it was entirely destroyed and swept away by a storm, in September, 1855, which destroyed all the wharves at that place, to his great loss; and that he at that time had a license and contract with the corporate authorities for the exclusive right to keep a public wharf there for toll, until the 22d November, 1861; that the wharves on the seacoast are of but short 'duration, constantly liable to destruction by storms, and to the ship-worm, which destroys them in two or three years, and have to be rebuilt at least once in every four years; and that one of the principal objects in having the town incorporated, was that there might be some proper authority over the subject of wharves, by which one might be kept up suitable to the wants and necessities of the place.

It is further alleged that, after the destruction of the appellant's wharf, the mayor and aldermen, on the 1st December, 1855, passed an ordinance, by which the appellant was authorized to build and put up, within three months from that date, in front of the city and in the place where the wharf which had been destroyed was erected, a new toll wharf, where all goods, freight, wares, merchandise, horses, cattle, and carriages should be landed, fixing the tolls to be charged by him; provided that, if the appellant accepted the terms

offered, he should be bound to keep the wharf in good repair, and should not suffer it to be out of repair for more than forty-eight hours, unless it should be injured or destroyed by storms, in which event it was to be repaired within three months, under a prescribed penalty, and the exclusive right to erect and keep a toll wharf within the specified limits of the city was granted by the ordinance to the appellant for a term of years, to expire on the 1st January, 1866, which was accepted by him, by his giving bond with security to keep the wharf in good repair, and to rebuild it within three months if destroyed, and paying the sum of twenty-five dollars for the privilege granted. The clause of the ordinance in relation to the nature of the right granted to the appellant, is in these words :

" Be it further ordained, that from and after the 1st December, 1855, until the 1st day of January, 1866, it shall not be lawful for any person or persons whomsoever, excepting the said John Martin, his executors, administrators, or assigns, to build, erect, or put up any wharf, for the purpose of landing or shipping any freight, goods, wares, merchandises, horses, cattle, carriages, &c., not their own property, within that part of the corporate limits of the said city of Shieldsborough, extending westerly along the sea-coast from the house formerly known as the house of Jesse Cowand, to the western boundary of said corporation: to which extent of coast the exclusive privilege of building, erecting, or putting up a public toll wharf is hereby granted to the said John Martin, his executors, administrators, and assigns, until the 1st day of January, 1866 ; and any person or persons, who, in violation of the present ordinance, shall build, erect, or put up any wharf in the limits herein mentioned, for the purpose of landing or shipping any freight, goods, &c., not their own property, shall forfeit and pay the sum of fifty dollars, to be recovered, &c.,  . . . .  and in addition thereto, shall be liable to the said John Martin in an action of damages for the violation of his privileges ; provided, that only one public toll wharf shall be built, erected, or put up within said limits."

That, in pursuance of this contract, he constructed a new wharf at the place designated, the best and most valuable one ever erected in the city, at a cost of twenty-five hundred dollars, having in all respects complied with his part of the contract.

The bill then charges that the appellees, who are residents of the

Martin *v.* O'Brien et al.

city of New Orleans, but reside in the summer in the city of Shields-borough and its vicinity, and own property there, have confederated to deprive the appellant of the just reward of his wharf and license; and, in order to carry out their object, have agreed and are about building a new wharf, for the purpose of shipping and landing goods and other freight, within the limits of the privilege granted to the appellant by the city ordinance, and that they have contracted with a workman, who is, and has been for some time, engaged in erecting their wharf, with the intention of making it a public wharf for shipping and landing the goods and freight both of themselves and of others, to the great injury of the appellant, in violation of his rights acquired by the ordinance, and impairing the contract made by him with the mayor and aldermen, to the extent of at least one-half of the profits of his enterprise; that the appellees pretend that they do not intend their wharf to be used as a toll wharf, but that the contributors to its construction and repair are to have the privilege of landing their freight and of shipping it without direct charge; but this is believed to be a mere evasion of the city ordinance, and at all events it is a violation of the appellant's exclusive rights, because if all the citizens were to unite in the arrangement, his rights secured by his contract would be entirely destroyed, and the large amount of money invested in his work in faith of the contract made by him with the city authorities, be lost; it is further charged that the appellees, through their agents, in furtherance of their objects, have endeavored to obtain from the board of mayor and aldermen, an ordinance altering the contract made by them with the appellant on the 1st December, 1855, and restricting the limits thereby guaranteed to him for the enjoyment of the rights granted to him, and authorizing the granting of licenses to other persons to keep public toll wharves within their limits, in violation of the ordinance previously made, and of the appellant's rights under it.

The bill prays for an injunction prohibiting the appellees from erecting any wharf for landing or shipping any freight, goods, &c., either for toll, or by any combination, association, contract and agreement between themselves, that the costs and expenses of erecting or keeping up their wharf shall be borne ratably by the parties, or by any other means or subterfuge, to evade or violate

the rights and privileges granted to the appellant, and for an account, and decree for damages caused to him by the acts of the appellees, and for general relief.

After the service of the injunction awarded and issued upon this bill, an *ex parte* petition appears in the record, filed by and in behalf of James A. Ulman, setting forth the service of the injunction, and that the petitioner, who was engaged as an employee of the appellees in building and erecting the wharf, was restrained from prosecuting his work at great loss, denying the exclusive right claimed by the appellant in his bill, alleging the unconstitutionality of the exclusive privilege granted to him by the ordinance, and that the appellees had the right to have their wharf erected for the purpose of using it for landing and shipping their own property, by virtue of the provisions of the same ordinance under which the appellant claims his right; that the injunction operates oppressively upon him, and if he is compelled thereby to forfeit his contract with the appellees for constructing their wharf, that irreparable injury will be done him, and that the remedy to him or to his employers upon the appellant's injunction bond would be an inadequate remuneration for the damages sustained by either of them in consequence of the injunction; tendering a bond sufficient for all damages to the appellant, and praying a modification of the injunction, so as to permit the petitioner to proceed with his work, and after its completion, that it might be used by the owners as a joint-stock wharf, for the landing and shipping of their own property, until the final hearing of the cause.

The petition was presented to J. S. Yerger, Judge of the Third Judicial District, who ordered that the injunction be superseded and modified, so as to allow the petitioner to continue to erect and complete the wharf; and a writ was issued accordingly, superseding the injunction.

Upon a like petition presented to the same judge by the appellees, the proprietors of the wharf enjoined by the appellant, he also ordered a writ of supersedeas to issue, modifying the injunction as previously ordered upon the other petition, and an injunction restraining the appellant from interfering with the erection and completion of the wharf, and with the owners of the wharf using

the same for themselves and their own profit; and writs of injunction and supersedeas were issued accordingly.

Afterwards a bill was presented by the appellees, by way of supplement to the last one above mentioned, to the judge of the Chancery Court in which the appellant's bill was filed, setting forth that since the proceedings above mentioned, and on the 5th July, 1856, the board of mayor and aldermen of Shieldsborough passed an ordinance repealing and annulling the ordinance of December, 1855, so far as it granted to the appellant the exclusive privilege of keeping a public toll wharf within the entire limits therein prescribed, and restricting the right of the appellant to much narrower limits, authorizing the appellees to make a public toll wharf within the limits embraced in the ordinance for the benefit of the appellant, and to receive for themselves the legal rates of toll. The bill alleges that this last ordinance was valid and regular, and that the previous one for the benefit of the appellant was both unconstitutional and in violation of the act of incorporation of 1854, so far as it granted the exclusive right to keep a public toll wharf to the extent of the entire limits of the city to the appellant; and it claims the right to the defendants, in virtue of this last ordinance, to keep a public toll wharf within the limits embraced in the previous ordinance, and prays for an injunction restraining the appellant from interfering with the defendants in their application for license to keep such public toll wharf and collect tolls, and for interfering in any manner with their proceedings under the last ordinance: The injunction was granted and issued as prayed, upon application to the judge in vacation and without notice, so far as is shown by the record.

At the December term, 1856, the appellees filed a demurrer to the original bill; and, at the same time, the appellant moved the court to reject from the files the bills filed by the appellees, and upon which the injunctions above mentioned were granted, because they were filed in violation of the rules of law and of established practice, and various grounds were stated in support of the motion. He also moved the court for a rule on the appellees to show cause why an attachment should not issue against them for violating the injunction in behalf of the appellant. These several motions were overruled.

Martin *v.* O'Brien et al.

The court overruled the demurrer, and the appellees filed their answer, which is also a cross-bill. It sets up the same grounds of defence taken in the bills for injunctions previously filed by the appellees, relies upon the validity of the repealing ordinance of July, 1856, in their favor, and claims the benefit of a license obtained by them from the corporate authorities under that ordinance, and prays that their right to keep their wharf as a public toll wharf, within the limits originally embraced in the ordinance for the benefit of the appellant may be decreed, and that he be perpetually enjoined from interfering with the right thereby acquired by them.

The appellees then moved to dissolve the appellant's injunction, and to dismiss the bill for want of equity on the face of the bill, assigning various reasons for the motion, which will be noticed hereafter. This motion was sustained, and the bill dismissed, and from that decree this appeal is taken.

It is agreed between the counsel for the respective parties, that the case is to be considered here without regard to the irregularity of the mode in which it was finally disposed of in the court below; and that, assuming the grounds of defence set up in behalf of the appellees against the claim of the appellant as having been formally made in that court, we are to consider the questions upon which the rights of the parties depend, as they were intended to be presented in the cause. We will therefore proceed to consider, in the first place, the questions involved in the merits of the case.

The first question which arises is, whether the Board of Mayor and Aldermen had power, under the terms of the act of incorporation of 1854, to grant to the appellant the right to keep a toll wharf upon the shores of the city, to the exclusion of all other persons within the entire limits of the city; and this depends upon the 14th section of the charter above quoted.

It is contended, in behalf of the appellees, that, inasmuch as that section gives power to the board to grant licenses "to all persons applying for the same," to erect and keep wharves, all persons desiring such licenses have the right to apply for and obtain them, under such rules as may be established by the board. But this is manifestly not the scope and spirit of the section. Its object was to grant *power to the corporation* upon the subject of wharves, not to vest rights in individuals; and it must be interpreted with refer-

VOL V.—3

ence to what the legislature especially had in view in enacting it. The power is conferred upon the corporation to grant licenses to all persons applying for the same; but this by no means gives all such persons the right to obtain the same.    That was a matter left to the discretion of the board, and which, from its nature, should have been left with them, as the persons most competent to exercise it in the manner best calculated to promote the welfare and convenience of the community, whose interests were intrusted to them. And, accordingly, the power is expressly given, to grant licenses to persons applying for the same, "with such privileges, exclusive or otherwise, as they may think proper." This provision is altogether incompatible with the idea that all persons had the right to obtain licenses to keep wharves; for there could be no exclusive privileges granted if all persons were entitled to obtain licenses.

But it is said that the power to grant exclusive privileges has reference to the rights granted to any particular person obtaining license for a particular wharf, excluding all interference of other persons with the rights acquired at that particular wharf.    This view appears to be without force; for if such was the intention of the statute, it gave no further right than such as would have existed without the provision.    A person taking out a license to keep a wharf, and receive the tolls thereof, at a particular place, had a perfect right to his own wharf and its emoluments, to the exclusion of all other persons, by virtue of his license; and that was secured to him by the law of the land, and did not require further protection.    It cannot, therefore, be supposed that the legislature intended to protect a right already amply secured by law; for that would be to suppose the enactment of a vain and useless provision.    The *power* conferred is to grant licenses to all persons applying for the same.    No duty is imposed upon the corporation nor right vested in the applicant; but the matter of granting the license or licenses is left subject to "the rules and restrictions, and with such privileges, exclusive or otherwise, as the board might think proper." This language does not appear to be susceptible of any other construction than that it is a grant of power to the corporation to grant to one or more persons the exclusive privilege of keeping a toll wharf, in such manner and upon such terms as they might think proper.    The entire power is confided to them in express language,

which cannot be avoided but by a disregard to terms which appear to be too plain for construction.

It is also abundantly manifest that the ordinance of December 1st, 1855, granted to the appellant the exclusive privilege of erecting and keeping a public toll wharf at the city until the 1st January, 1866, expressly prohibiting all other persons from putting up any wharf within the limits of the city, during that period, for the purpose of landing or shipping goods, freight, &c., not their own property, and assuring to the appellant the enjoyment of the right granted to him. And in consequence of this ordinance, that he took out the license required by the regulations adopted by the board, paying the sum of money required, and entered into bond with security for the construction and good keeping of the wharf. There can, therefore, be no doubt but that he acquired an exclusive privilege in virtue of the ordinance and of his contract under it, against the erection of a toll wharf, within the limits designated, by any other person, if the act of incorporation authorizing the grant was valid and constitutional.

This brings us to the consideration of the objections to the provisions of the 14th section of the act on the ground of unconstitutionality. 1. It is objected that the power to grant the exclusive privilege to the appellant conferred by the act, is in violation of the first section of Article I of the Constitution of this State, which declares, that "no man or set of men are entitled to exclusive, separate public emoluments or privileges from the community, but in consideration of public services."

This provision of the constitution evidently has no application to the circumstances of this case. The legislature, for reasons which must be presumed to have been sufficient, thought fit to incorporate the city of Shieldsborough, and to make provision in relation to the granting of licenses for keeping public wharves within its limits—a subject in which the interests of its citizens were much involved—giving to those to whom the management of the public affairs of the city was to be committed, the power to act upon that subject in the way they might think best for the public interest. From the nature of the subject, and the local situation of the place, it might become necessary to grant an exclusive right to keep a public wharf there to some one or more persons, in order to secure

the benefits of such an improvement; and hence, the legislature thought fit to intrust that power to the discretion of the corporate authority, to be exercised if in their judgment the public interest required it. The power to judge of the necessity was confided in them, and if they determined that it was necessary, to secure the advantages of such an improvement to the public, that an exclusive right to the profits of the work should be granted to the contractor, it must be considered that the privilege granted was in consideration of public services. Such franchises are presumed to be granted on valuable consideration. 3 Kent's Comm. 458. It is well settled that the legislature has power to grant such privileges for the public benefit. 3 Kent's Comm. 458; 15 John. Rep. 387; *Charles River Bridge* v. *Warren Bridge,* 11 Peters, 420; and it is entirely competent to delegate the same power to the proper public authorities.

2. It is said that no power existed in the State to grant the exclusive right and occupation of the shores of the sea to any man, because the sea, by universal law, is open and free to all persons. This is correct with respect to the open or high seas, but it does not apply to the shores of the sea, or to the waters immediately adjacent to those shores. 1 Kent's Comm. 26, 29. In such cases the jurisdiction of the State extends so far as may be necessary for the public safety and the undisturbed use of the adjacent shores. But the shores of the sea below high water mark belong to the State as trustee for the public, and may, by grant, become private property, or the subject of an exclusive private right; and the right of the owners of the land bounded by the sea extends no further than to high water mark. 3 Kent, 427.

This objection is, therefore, untenable; and it also follows, from these rules of law, that the position taken in behalf of the appellees, that the owners of lands lying on the sea-shore have the right to build wharves for their own use into the sea adjoining the front of their lands, and cannot be deprived of that right by grant under legislative authority, cannot be maintained.

We are, therefore, of opinion that the act of incorporation is not in violation of the constitution, or of any vested rights of the appellees.

Again, it is insisted that it appears by the bill that the exclusive privilege granted to the appellant by the ordinance of December,

Martin *v.* O'Brien et al.

1855, was without consideration beneficial to the city, because he was then bound by a contract with the board to rebuild his wharf, and to keep it in repair until November, 1861. But it appears that the board, under the peculiar circumstances of his situation, thought fit to cancel that contract, and to make the contract now under consideration. That was the act of competent authority; and then the new contract was made, the appellant paying the requisite sum for the new license granted, and executing a new bond for the performance of his duties under that contract. Under such circumstances, it cannot be said that the new contract was not supported by a sufficient consideration.

An objection is taken to the extent of the injunction, issued in behalf of the appellant, because it enjoined the appellees from the erection of their wharf, and also from the use of it, thereby depriving them of the right to erect and use their wharf for landing and shipping *their own property*, which right was expressly reserved to them in the ordinance under which the appellant's right was granted.

This objection is well founded, if the facts upon which it is based be as they are assumed. The prohibition of the ordinance is against "building, erecting or putting up any wharf for the purpose of landing or shipping any freight, goods, &c., *not their own property*," &c.; and the same reservation is made in the latter clause, declaring the punishment for a violation of its provisions. It is thus obvious that the appellees had the right to erect a wharf for the purpose of shipping or landing their own property; and, if erected solely for that purpose, that they were not subject to be enjoined from constructing it. If, however, it was being erected for the purpose of being used after it was completed as a toll wharf, the purpose was unauthorized and illegal, and, being in violation of the appellant's rights, he was entitled to enjoin its construction; or after it was erected, if used in violation of the ordinance, he had, for the same reason, the right to enjoin such use of it. But the question, whether the wharf was either being erected for the purpose of being used as a toll wharf, or was so used after its erection, is not now properly before us for determination, as the case is presented for our consideration as upon demurrer to the bill, or upon motion to dissolve the injunction for want of equity on the face of

the bill.   And the determination of the question will be a matter for the court below in the further progress of the cause, and will depend upon the proofs to be made.

It follows from the views of the case above taken, that the appellant was entitled to the exclusive privilege granted to him by the city ordinance; and the doctrine is too well settled to be questioned, that that ordinance and the obligations entered into by the appellant under it constituted a contract securing the exclusive privilege granted to the appellant, and which the Board of Mayor and Aldermen could not violate.   Consequently, the ordinance of July, 1856, annulling and amending the grant as it had been made by the previous ordinance to the appellant, and giving the license to the appellees to erect and keep a toll wharf within the limits embraced in the contract with the appellant, was an act impairing the obligation of the appellant's contract, in violation of his vested right under it, and therefore illegal and void.

Having thus considered the principal questions presented, and involving the merits of the controversy, we proceed to examine the question of the regularity of the proceedings taken by the appellees, to suspend and modify the injunction granted in behalf of the appellant.

It appears that after the appellant's bill had been filed in the Chancery Court of Hancock county, and after his injunction had been regularly issued and served, and whilst it was in full force, the appellees presented to the Honorable J. S. Yerger, a circuit judge of a different district, two petitions or bills, praying that the injunction should be superseded and dissolved in part; and process was accordingly awarded by that judge, and issued, superseding and dissolving the injunction in part.   Such a proceeding was irregular and contrary to the established rules, which vested in the Chancery Court of Hancock county jurisdiction over the subject-matter of the injunction which was then pending.   And while it is true that our laws give to the circuit judges the power to grant injunctions in cases beyond the bounds of their districts, that power is given with reference to cases not then pending in any court of competent jurisdiction, or to cases where it may become necessary, in aid of the jurisdiction already acquired by such court, and for the purposes of justice, that such writs should be granted.   But the power

was never intended to be given to judges of other courts to interfere with the jurisdiction already acquired, by modifying or setting aside the orders made by the court having acquired jurisdiction of a cause. When the jurisdiction of the cause becomes regularly vested in the court, it is necessarily exclusive, and no other judge has the power, pending the suit, to set aside the orders, or in any manner thwart the exercise of the jurisdiction. Such a course would be anomalous, and would lead to the most serious evils of multiplying litigation and producing confusion in the administration of justice, and conflicts of jurisdiction in relation to the same subject-matter of litigation. If any other court has the power to take steps and make orders in relation to a pending suit but the court in which the cause is pending, any number of judges have the same power; and thus, instead of a suit and its incidents being subject to the exclusive jurisdiction of the court where it is pending, any or all the other judges of the State may interfere with it, and alter, set aside, or thwart the orders made by the court to whom the jurisdiction is committed by law.

The course to be taken by the appellees was plain and well established in chancery practice,—to move, before the judge having jurisdiction of the cause, upon a proper showing, for a dissolution or modification of the injunction, and for liberty to exercise the rights set up in these bills; and upon which motion the appellant would have had the right to be heard, of which he was debarred by the course pursued.

We think, therefore, that the writs of supersedeas and injunction referred to were irregular and void, and that they should have been set aside on the motion of the appellant.

The injunction last obtained by the appellees was granted by the judge having jurisdiction of the cause. But the bill upon which it was granted was irregular and unnecessary. The subject-matter of controversy was then pending by virtue of the original bill of the appellant, and it was entirely competent for the appellees to assert their rights and obtain the relief which they claimed by answer and cross-bill in that suit; and this course was afterwards taken by them. The bill, therefore, filed by them, and praying for an injunction, was an unnecessary and irregular step to dissolve the injunction of the appellant. It was virtually a proceeding, by an-

other and a separate bill, to dissolve the injunction. This was irregular and unprecedented. It cannot be regarded in a more favorable light than as a motion to dissolve the injunction; and so regarded, it was irregular, and the process prayed by it should not have been granted, because the statute requires, that motions to dissolve injunctions in vacation before the judge having jurisdiction shall be upon notice to the adverse party. Statute 1856, Rev. Code, 551, Art. 70.

The motion to dismiss this bill and to set aside the injunction ought, therefore, to have been sustained.

Under these views of the case, the decree is reversed, the interlocutory bills filed by the appellees dismissed, and the cause remanded, to be proceeded with according to the principles herein stated.