199 So.2d 627 (1967)
John TREUTING and the State of Mississippi
v.
BRIDGE AND PARK COMMISSION OF the CITY OF BILOXI, Mississippi.
No. 44711.
Supreme Court of Mississippi.
June 5, 1967.
*629 Edward G. Tremmel, Jules Schwan, Biloxi, Joe T. Patterson, Atty. Gen., by Martin R. McLendon, Asst. Atty. Gen., Jackson, for appellants.
Jacob D. Guice, Thomas J. Wiltz, Biloxi, for appellee.
ETHRIDGE, Chief Justice:
This suit, originating in the Chancery Court of Harrison County, was brought by the Bridge and Park Commission of the City of Biloxi (called Park Commission), appellee. It is a suit to confirm the title of the Park Commission to (a) approximately 12.58 acres of land, with accretions, constituting the west end of Deer Island in the Mississippi Sound, and (b) 150 acres of submerged lands in the Mississippi Sound adjacent to this island property. The State of Mississippi (appellant) was the original defendant. John Treuting intervened as an additional defendant, objector, and taxpayer. The trial court confirmed the title in fee of the Park Commission, and we affirm.
The lands in question were conveyed by the State in fee simple to the Park Commission, pursuant to legislative authorization. The principal issue is whether this conveyance was a valid exercise by the State of its duty to the citizens of the State as trustee of the submerged lands.

I.
Deer Island is a small body of land in the Mississippi Sound of the Gulf of Mexico, lying about one-fourth mile south of the City of Biloxi. Biloxi is a densely populated municipality, located on a peninsula bordered on three sides by Biloxi Bay and the Mississippi Sound, and is in urgent need of physical space for expansion. In 1955, by a local and private law, the legislature authorized the Biloxi Park Commission to cooperate with a private corporation, owner of part of the island, in an overall plan for development of the island and adjacent submerged lands. Miss. Laws 1955, Extra. Sess., Ch. 265, amended by Miss. Laws 1958 Ch. 814. In 1959 this Court held that this plan was void because it violated provisions of the state constitution prohibiting a loan of municipal credit to a private corporation, and the granting of state lands to a private corporation by local law. Giles v. City of Biloxi, 237 Miss. 65, 112 So.2d 815, 113 So.2d 544 (1959).
In 1960 the legislature set up a new and different method under a general law for the development of offshore islands in the Mississippi Sound lying within three leagues of the corporate limits of a municipality. Miss.Code 1942 Ann. §§ 5974-01 to 5974-16 (Supp. 1966), being Miss. Laws 1960 Ch. 434, as amended, Miss. Laws 1962 Ch. 216, Miss. Laws 1964, First Extra.Sess., Ch. 20, Miss. Laws 1966 Ch. 274. This statute authorized the governing authorities of a municipality to create a bridge and park commission, with the powers of eminent domain and the purchase and sale of land, including the right to purchase an island in whole or in part situated in the Mississippi Sound.
Section 5974-04(b) provides:
Any such commission which has acquired an island or islands, in whole or in part, adjacent to any submerged lands belonging to the State of Mississippi may purchase from the State of Mississippi a sufficient amount of such submerged lands to be reclaimed and added to such island or islands to be used, and developed for the purposes provided in this act. And the State Land Commissioner, with the approval of the Attorney General and the Governor, is hereby authorized and empowered to sell and convey such submerged lands to such commission and to issue the State's patent thereto. Said commission shall have the power to dredge, fill in and reclaim submerged lands adjacent to any such island or islands and to develop and utilize the same for any of the purposes set forth in this *630 act, including the financing of the public improvements herein authorized; provided, however, that no normal or natural channel shall be obstructed so as to interfere with the normal navigation therein, it being the purpose and intention of this act to authorize the use and development of shallow bottoms and shoal waters in the areas herein set out for the purpose of filling and reclaiming same for the purposes herein set forth and where said bottoms are not susceptible to reasonable navigation at all times as a practical matter.
Such a park commission is granted power to construct bridges connecting the island with the mainland. Miss.Code 1942 Ann., § 5974-04(c) (Supp. 1966). It can construct public parks, viaducts, harbors, marinas, streets, playgrounds, schools and a multitude of other facilities in developing islands in the sound. § 5974-04(d). It is authorized to lease or sell to private persons or corporations any land, including reclaimed or filled-in lands, when it finds the same is unnecessary for park, recreational, or other public purposes. Section 5974-04(e) (1) states:
Said commission shall have power to lease or sell to private persons or corporations, real estate or any interest therein, acquired hereunder, whether improved or unimproved, and including reclaimed or filled-in lands, whenever it shall find such real estate or interest therein is or has become unnecessary for park or recreational purposes for the benefit of the public, or for other public use, and in the event of sale, to convey to the grantee, fee simple title to such real estate. Prior to the leasing or conveyance of any such real estate, the commission shall, by resolution spread upon its minutes, find, determine and adjudicate that the property, to be so leased or sold and conveyed, is, or has become unnecessary for park and recreational purposes for the benefit of the public, or other public use, and such findings, determination and adjudication shall be final and conclusive and shall not thereafter be questioned in any court; provided, however, that lands acquired by eminent domain under the provisions of this act may not be sold, and may not be leased except for public purposes and continuing public uses, and when such lands cease to be used for public purposes, the title to same shall revert to the former owners, or their successors or assigns.
A park commission is directed, when it has acquired submerged land, to bring a suit to confirm the title against the state and the world. Section 5974-04(e) (2) then directs:
Upon the hearing of such cause, if the court shall find that the reclamation of the said lands does not constitute an obstruction of the navigable waters of the State and does not interfere with the rights of the public generally to use the navigable waters of the State for fishing, boating, and other public uses, and that the reclamation and sale of said lands has or will, in whole or in part, contribute toward the deepening of a channel or channels for boats and improvement of navigation of any of the navigable waters of this State, and that a fair and adequate consideration has been paid or is to be paid for such property, then the court shall confirm the title to the property and forever set at rest any claims by the State of Mississippi in its sovereign capacity as proprietor of said lands.
Finally, a park commission is given the power to sell or lease to private persons or corporations "real estate other than the submerged lands reclaimed by it," whenever it finds that it has become unnecessary for park, recreational or harbor development purposes for the benefit of the State, and "to convey to the grantee the fee simple title to such real estate." § 5974-04(f).
The Biloxi Port Commission is a separate agency of the City of Biloxi. In 1963 it purchased from Ralph B. Wood two tracts on the west end of Deer Island, of 11.58 acres and one acre. On February 1, 1966, the Biloxi Port Commission conveyed this 12.58 *631 acres to the Park Commission. On February 24, 1966, the State by its land commissioner conveyed to the Park Commission two tracts of land, described by governmental subdivision, aggregating 150 acres, and lying north and south of the 12.58 acres of island property purchased from the Biloxi Port Commission.
In February 1965 the Biloxi Park Commission contracted with a firm of consulting engineers for complete engineering services in planning and constructing the Deer Island project. Deer Island is a spit of land approximately five miles long, varying in width up to 2500 feet and containing approximately 550 acres above sea level. A considerable portion of the island is bordered by mud flats which are covered by water of a mean depth of three to four feet. The plan submitted by the engineering firm contemplates filling in some of these adjacent mud flats to expand the dry land area of the island. The Park Commission plans to acquire the entire island and adjacent submerged lands by purchase or eminent domain proceedings.
The fill material will be taken from the submerged lands to the north of the island, and will be used to raise the north shore of the island to an elevation of fifteen feet. The south shore will be raised to eighteen feet, and the interior of the island will be at five feet above sea level. A levee or embankment will be constructed around the perimeter of the island, and sheet pile walls of eighteen feet on the north side and twenty-one feet on the south side will be constructed. The south side of the island will have a beach 460 feet wide.
The project will significantly increase the land area of Deer Island, but it will not interfere with fishing or navigation. In fact, navigation through Biloxi Bay should be improved due to the fact that much of the fill material to be used on the island will be dredged from the existing Biloxi Channel which connects with the seaway. Once the project is completed, Deer Island will contain a large marina and some 46 miles of inland waterways fronted by residential property. The improved channel will give better access to seafood packing plants for fishing boats, and the increased area of the island will reduce wave action on the shore of Biloxi, offering greater protection to the Biloxi harbor area.
When the project is completed, approximately twenty-seven percent of the land area of Deer Island will be devoted to public uses. Included in this classification is land for two 18-hole golf courses, two nine-hole courses, beaches, parks, green belts, waterways, schools, churches, marinas, and similar facilities. Another twenty percent of the island's surface will be allocated to such uses as street rights of way, utility easements, sewage treatment plants, water wells, and fire stations. The remaining fifty to fifty-three percent of the island will be devoted to residential, commercial and resort development. The completed project will offer 8,700 residential units for sale on the island. A fixed level bridge to the island will be built with a horizontal clearance of 125 feet and a vertical clearance of 50 feet. All of the some 280 vessels which make Biloxi their home port will be able to pass under this bridge. The interior waterways will be closed off from the outside water by a system of hurricane gates, operated by diesel engine. Drainage in the interior of the island will be provided by pumping stations.
The cost of constructing the project is estimated to be some forty million dollars. The project will be financed by revenue bonds, secured by the sale of property on the island. Revenue from the island is expected to produce some forty million dollars.

II.
Mississippi Constitution section 81 (1890) provides:
The legislature shall never authorize the permanent obstruction of any of the navigable waters of the state, but may provide for the removal of such obstructions *632 as now exist, whenever the public welfare demands. This section shall not prevent the construction, under proper authority, of draw-bridges for railroads, or other roads, nor the construction of booms "and chutes" for logs in such manner as not to prevent the safe passage of vessels, or logs, under regulations to be provided by law.
The chancery court found, upon virtually undisputed evidence, that the Deer Island project would not be violative of section 81 because it would not be a "permanent obstruction of any of the navigable waters of the state." As a practical matter, the waters around Deer Island which will be directly affected by this project are of little value in navigation at the present. They are shallow and shoal waters which are not susceptible of reasonable navigation. On the other hand, the Biloxi Channel, the chief navigation route through Biloxi harbor, will not be hindered by the project but will be widened and deepened by the dredging operations. Navigation will be further aided by the availability of more marinas, harbors, wharves, and piers on the island. The filling of the submerged lands in question will have no tangible effect upon the right of the public to use the navigable waters of the state for fishing, boating and related endeavors.
Accordingly, the facts here reflect that the proposed development of Deer Island will not constitute a permanent obstruction of any of the navigable waters of the state within the meaning of Constitution section 81. To the contrary, it will improve navigation, boating and fishing, and will be in the public interest generally. Section 81 does not prohibit either directly or impliedly the sale of these lands to the Park Commission, a governmental subdivision, or their sale by the Commission to private individuals for private purposes, if after development of the island for public purposes, the Park Commission finds it unnecessary to retain some of these lands as a part of the overall development. The context of section 81 is directed toward free navigation. It has nothing to do with the alienation of mud flats and waters not suitable for navigation in fact, or the sale of submerged lands. Money v. Wood, 152 Miss. 17, 118 So. 357 (1928), held that a patent from the land commissioner to private persons of submerged lands around Deer Island, for the purpose of erecting a hotel on an artificial island, was void, because it deprived the owners of the west end of the island of their riparian and littoral rights, and was a sale to a person for purely private business. The indication therein that section 81 of the Constitution prohibited the sale of submerged land was unnecessary to decision of that case. 152 Miss. at 29, 118 So. at 359. In short, the trust character of the state's title and ownership is not constitutional but common-law doctrine.

III.
At common law the title to all lands under the tidal waters below high water mark belonged to the crown, and were held by the king in trust for the use of his subjects. The primary uses were navigation, bathing and fishing. Thus it was held that the title of the king was vested in him for the benefit of the people. This common-law doctrine was carried over into the United States, including Mississippi. The state holds title to lands under the tidal navigable water in trust for the people, for the purposes of navigation, fishing, bathing and similar uses.
A good statement of the general rule is given in Hayes v. Bowman, 91 So.2d 795, 799 (Fla. 1957):
Basically it is trust property and should be devoted to the fulfillment of the purposes of the trust, towit: the service of the people.
However, consonant with the common law rule, the State may dispose of submerged lands under tidal waters to the extent that such disposition will not *633 interfere with the public's right of navigation, swimming and like uses. Moreover, any person acquiring any such lands from the State must so use the land as not to interfere with the recognized common law riparian rights of upland owners (an unobstructed view, ingress and egress over the foreshore from and to the water).
The question is whether the trust of the state, because of its nature and purposes, prevents alienation in fee simple of the submerged lands. The pertinent rules are common law rules. The primary public purpose of the trust was to prevent interference with navigation. Its secondary public purpose was to protect fishing and marine life. Moreover, there is a private trust associated with the submerged bottoms running in favor of the upland owner whose lands border the line marked by the mean high tide. Harrison County v. Guice, 244 Miss. 95, 140 So.2d 838 (1962).
The Mississippi cases recognize these basic purposes of the trust in the state. Martin v. O'Brien, 34 Miss. 21 (1857) (navigation, aquatic rights). Money v. Wood, for example, observed that the state as trustee cannot "dispose of such lands in any manner or extent inconsistent with the purpose for which the trust exists * *." Navigation and fisheries were said to be the main factors.
Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291 (1933), stated the common-law origins of the trust rule, with the state holding the land for public purposes, the chief ones being commerce, navigation and fisheries. State ex rel. Rice v. Stewart, 184 Miss. 202, 184 So. 44 (1938), sugg. error overruled, 185 So. 247 (1939), discussed at some length the trust theory, but recognized again the principal purposes of the trust to be navigation and fishing. Xidis v. City of Gulfport, 221 Miss. 79, 72 So.2d 153 (1954); Crary v. State Highway Comm'n, 219 Miss. 284, 68 So.2d 468 (1953); Higgins v. City of Santa Monica, 62 Cal.2d 24, 41 Cal. Rptr. 9, 396 P.2d 41 (1964); 65 C.J.S. Navigable Waters § 99(3) (1966); 56 Am.Jur. Waters § 471 (1947).
When the common law of England developed with reference to a public trust, navigation and fisheries were perhaps the only considerations. The values of the underlying mineral estate were not involved. No thought was given to the dredging and filling in of mud flats and other marginal submerged lands, unsuitable for navigation, for commercial, industrial, recreational and residential use. In fact, there was no machinery capable of such work.
Under the particular facts of this case, the chancery court was warranted in concluding that the state could convey to the Park Commission fee simple title to the submerged lands in question, for public purposes and uses in the overall development of Deer Island. Moreover, the legislature was justified in authorizing sale of these lands, when filled in and developed, to private individuals as an incident to the overall public interest and purpose in accommodating an expanding population, commerce, tourism and recreation. There will be no substantial interference with the original purposes of the trust imposed upon the state in connection with these submerged lands, and the development as authorized by the statutes is consistent with the public trust. Denial of the legislature's power to provide for development of Deer Island in the manner intended by the Park Commission would be inconsistent with the public trust which the state is charged with administering. It would frustrate any practical attempt to put these lands to any meaningful use, public or otherwise.
The sale of individual lots to private owners cannot be separated from the general context of the overall public purposes involved. If the totality of the development promotes the public interest in general, the incidental private ownership of individual lots does not negative the comprehensive public purpose.
*634 In Pearl River Valley Water Supply District v. Brown, 248 Miss. 4, 156 So.2d 572, 158 So.2d 694 (1963), the land owner contended that proposed use of his land, taken by eminent domain, for restaurants and other private purposes, with reference to a large reservoir project of the state, constituted the taking of private property for private use, prohibited by Constitution section 17. It was held that these specific matters could not be isolated "from the context of the public purposes involved. The primary and paramount purpose and use is not for a restaurant or other incidental facility." There were three primary public uses, control of pollution, control of access to the reservoir, and to provide recreation. The private uses were "mere incidents to the primary and paramount public uses, but are nevertheless essential uses in connection with the primary public uses." Culley v. Pearl River Industrial Commission, 234 Miss. 788, 814, 108 So.2d 390, 399 (1959), upheld the constitutionality of the power of the same district to lease or sell for private use lands acquired by condemnation when they are no longer necessary for public use, or the proposed lease or sale is incidental to the public purposes. Paulk v. Housing Authority of City of Tupelo, 195 So.2d 488 (Miss. 1967) (condemnation for urban renewal project, resale to individuals upheld).
In short, because the overall purposes of the proposed development of Deer Island promote a large number of public interests and uses, the incidental private ownership of parts of the development is not inconsistent with the public trust in the submerged lands. In essence it is an effectual development and discharge of this trust.

IV.
The conveyance of 12.58 acres with accretions by the Biloxi Port Commission to the Park Commission was valid. By an earlier statute the Biloxi Port Commission was given authority to reclaim submerged lands. Miss.Code 1942 Ann. § 7549.7-01 (1956). It may sell or lease them "for industrial use," on such terms as will best promote and protect the public interest. Id. § 7549.7-02. Moreover, the phrase
"[I]ndustrial operations" * * * shall include but not be limited to any and all enterprises the operation of which will aid in the development of fisheries, commerce, navigation or shipping in the port, as well as all forms of manufacturing enterprises. Id. § 7549.7-04.
The port commission act is for the development of "fisheries, commerce, and shipping in the state," and grants additional authority to the port commission. Id. § 7549.7-08.
These statutes and the facts authorized the port commission and the governing authorities of the City of Biloxi to convey the land to the Park Commission. The proposed development of Deer Island will promote navigation and fishing, and will give some protection to the Biloxi port. Navigation will be assisted by deeper channels. Biloxi fisheries will be better protected from storms and dangerous weather. Necessary additional housing for the geographically restricted City of Biloxi will promote additional manufacturing, and assist in the industrial development of the area. The chancery court was amply justified on this record in reaching these conclusions.
Affirmed.
All Justices concur.