Money *et al.* v. Wood.*

(Division B.   Oct. 8, 1928.)

[118 So. 357.   No. 27001.]

18

*Corpus Juris-Cyc. References: Constitutional Law, 12CJ, section 220, p. 78S, n. 1; Navigable Waters, 45CJ, section 17, p. 417, n. 8; section 207, p. 537, n. 16; section 212, p. 539, n. 68; section 226, p. 548, n. 25; section 227, p. 549, n. 43; Statutes, 36Cyc, p. 1106, n. 29.

*Gardner, Brown & Morse* and *May, Sanders & McLaurin,* for appellants.

22

*Monroe & Lehman* and *Stevens & Heidelburg,* for appellee.

24

Argued orally by *J. O. S. Sanders,* for appellant, and *R. W. Heidelberg,* for appellee.

ETHRIDGE, P. J.  The appellee, Wood, filed a bill in the chancery court to prevent the appellants from erecting a structure, in the Mississippi Sound, in front of his home, in Biloxi, Miss., and in front of his property on the west end of Deer Island. It appears that the appellants had undertaken to buy lands from the state of Mississippi lying under the waters of the Mississippi Sound for the purpose of constructing and erecting an artificial island, with hotels, boulevards, and residences for the private purposes of the appellants; that the appellants had procured from the land commissioner of the state of Mississippi deeds to certain lands described according to what would have been the sections had the governmental surveys extended into the Mississippi Sound to the point where the said submerged lands lie.

The deeds from the land commissioner recited on their face that the above lands are tidewater lands and were sold under section 2919, Code 1906 of the State of Mississippi. The price paid for them was at the rate of one dollar and twenty-five cents an acre.

The defendants, appellants here, had entered into a memorandum agreement with certain parties, in which the lands purchased from the state were described, and same contained, among others, the following stipulation:·

"4. Whereas, the said parties of the second part desire to acquire the premises described in paragraphs one and two above for the purpose of improving and developing same, by dredging, filling, and raising of so much of said land as is practicable to a height of at least nine feet above normal high tide, by building a good and sufficient sea wall, together with sidewalk and boulevard construction, around the area filled, in accordance with definite plans and specifications to be submitted, and to beautify the property generally; by constructing a modern fireproof resort type hotel of not less than two hundred and fifty (250) rooms, containing or having in connection therewith an auditorium or a convention hall having a seating capacity of three thousand (3,000) or more persons; to construct a reinforced concrete multiple arched type bridge, equipped with such draw span as may be required by the Federal or state Government, together with ample sidewalk provisions on each side, over the ingress and egress to the property described in paragraph two above, and to subdivide into an allotment in accordance with a plat made by the parties of the second part, with streets properly dedicated as public highways, consisting of a boulevard around the entire property next to the sea wall, having a width of not less than seventy-five to one hundred feet, and all other streets to be from thirty to one hundred feet in width, subject to the terms, conditions, restrictions and prohibitions herein contained."

The stipulations in the said tentative agreement from which we have quoted show the projected improvements are not for any purpose appurtenant to the rights of the public in and to the waters and lands under the waters, such as navigation, etc., but that they were for private enterprise, designed as a scheme of financial advantage to the appellants.

In his bill, the complainant, Wood, challenged the right of the land commissioner to sell the lands involved in this controversy, alleging a want of authority in said land commissioner to make a sale of such lands, and setting up also that he was the owner of certain property situated on the beach at Biloxi, Miss., and certain property on the west end of Deer Island, which is part of an island lying off the shore in the Mississippi Sound, and that said construction would invade his rights as enjoyed under the laws of the state, and that such construction would so interfere with his navigation, fishing, and other legitimate uses of the public waters which he enjoyed, and that it would cause the waters to so flow in time of storm and similar disturbances as to wash away his property on Deer Island, and that such construction would interfere with the enjoyment of his property both on the beach and on Deer Island.

The chancellor on the hearing granted an injunction restraining the construction of the proposed improvement, and held that the land commissioner had no power to make the conveyance of said lands to the appellants, making perpetual the injunction and canceling the appellants' deeds.

The section relied upon by the appellants to convey the lands, as shown on the face of the patents, is section 2919, Code 1906 (section 5254, Hemingway's 1917 Code), which reads as follows:

"All lands fallen or falling to the state by escheat, or coming to it in any other manner; and all accretions of land not the subject of private ownership, and particu-

larly those accretions near the mouth of the Pascagoula river, heretofore surveyed by the state; and all other lands within the borders of the state, and not belonging to the United States nor owned by another, are the property of the state, and are to be managed and disposed of through the land office; and the land commissioner may sell any of such lands at the same price as the swamp and overflow lands, subject to be fixed in the same manner and under like regulations. He may, in his discretion, rent out any public land which is improved or tillable, in the same manner and under like conditions as he may rent out improved or tillable tax land.''

In construing this statute, the true purpose is to get at the intention of the legislature, and the statute must be construed with the provisions of the Constitution indicating the public policy of the state, and, if reasonably possible, must harmonize with the public policy and provisions of the Constitution, and, if the general language of the statute is unduly broad, and is capable of more than one construction, the court will limit and restrain the language used to conform to the manifest purpose of the legislature and the constitutional provisions involved. Section 81 of the Constitution provides:

''The legislature shall never authorize the permanent obstruction of any of the navigable waters of the state, but may provide for the removal of such obstructions as now exist, whenever the public welfare demands. This section shall not prevent the construction, under proper authority, of drawbridges for railroads, or other roads, nor the construction of booms 'and chutes' for logs in such manner as to prevent the safe passage of vessels, or logs, under regulations to be provided by law.''

Section 8347, Hemingway's 1927 Code (section 4407, Code 1906), provides:

''All bays, inlets, and rivers, and such of the lakes, bayous, and other watercourses as shall have been, or

may be, declared to be navigable by act of the legislature or by the board of supervisors of the county in which the same may be, shall be public highways.''

At the common law, lands lying between high and low tide were lands of the king, but held by him as trustee in his sovereign capacity for all of the people and not by him in a proprietary capacity. When the several states were recognized as free and independent governments by the English nation after the Revolutionary War, the ownership of, and dominion and sovereignty over, lands covered by tidewaters, and the fresh waters of the Great Lakes, within the limits of the several states, belonged to the respective states within which they were found, with the consequent right to use or dispose of any portion thereof, when that could be done without impairment of the interest of the public in the waters, subject to the right of Congress to control their navigation for the regulation of commerce. In the case of the *Illinois Central Railroad Co.* v. *State of Illinois,* 146 U. S. 387, 13 S. Ct. 110, 36 L. Ed. 1018, the United States supreme court discussed the question involved in a long and luminous opinion in which it held that a trust devolved upon the state for the public, and that it could only be discharged by the management and control of property in which the public has an interest, and could not be relinquished by a transfer of the property. It was further held that the legislature of Illinois could not deprive the state of control over the bed and waters of the harbor of Chicago, and place the same in the hands of a private corporation, that the bed or soil of navigable waters is held by the people of the state in their character as sovereign in trust for public uses for which they are adapted, and that there can be no irrepealable contract in a conveyance of property by a grantor in disregard of a public trust, under which he was bound to hold and manage it.

There are two lines of authority with reference to the power of the state to sell lands under the tide and

navigable waters of the state which are held in trust by the state for the people—one of which holds that the state, as trustee, has no right or power to dispose of such lands in any manner or extent inconsistent with the purpose for which the trust exists; the other, that the state, being owner of the property, can in its sovereign capacity convey the fee absolutely so as to deprive the people of future control of such lands. The supreme court of the United States holds that this is a question of law for the state to decide, but, in the case of the *Illinois Central Railroad Co.* v. *State of Illinois, supra,* this court gave its own ideas, interpretations and construction of such power.

It seems to us that section 81 of the Constitution was adopted by the Constitutional Convention for the purpose of aligning this state with that line of authorities which hold that the state cannot convey in fee such rights to private owners for private purposes. We are satisfied that this section of the Constitution applies to the waters here involved, and to the lands under such waters, and that such waters are regarded as navigable. In *Huber* v. *Freret et al.,* 138 Miss. 238, 103 So. 3, this court had occasion to construe the statute authorizing the land commissioner to convey lands held and owned by the state, the identical statute here relied upon, and held that no authority was given the land commissioner by such statute to issue patents to urban public lands, surveyed into lots, belonging to the state, for business purposes. In that opinion the court said:

"It must be admitted that the language used in the statute defining what constitutes public lands belonging to the state is broad enough to cover urban business property. But taking its context, and especially construing that section in connection with the other section of the statute mentioned, section 2912, Code of 1906 (section 5247, Hemingway's Code), and also in connection with the entire scheme and purpose of our legislation in

reference to public lands, as evidenced by the chapter in the Code on the subject, we are of opinion that it was not the purpose of the legislature to deal with urban business property surveyed and divided into blocks and lots; that it was the purpose of the legislature to deal alone with those public lands which are usually bought and sold by acreage, in other words, property commonly known as rural lands, lands valuable for their timber or pasturage or for agriculture. It is true in order to so hold we must go beyond the strict letter of the statute. But that is justified in a proper case, and we think this is a case of that character.

"This court has often held that, where the meaning of a statute is ambiguous, resort may be had to the real purpose and intention of the legislature in adopting the statute, which when ascertained the court will give effect thereto even though the letter of the statute is violated [citing authorities]."

We think the word "land" used in the statute means lands as distinguished from water. One of the definitions given by Webster is the "solid part of the surface of the earth as distinguished from water, constituting a part of such surface, especially from oceans and seas." It is certain, under this statute, that the legislature did not intend to vest the land commissioner with the discretion of selling any of the lands owned by the state at one dollar and twenty-five cents an acre, or at a price to be fixed by the authorities named in the Code for that purpose. It is unnecessary to decide whether it would be possible for the state to sell such lands in fee independent of a constitutional restriction. It certainly would be a breach of duty for the legislature to do so, and we think in the case before us section 81 of the Constitution prevents the sale of the lands of the character here involved to a person for purely private business, and that the deed from the land commissioner to the appellants is null and void.

We have been cited to numerous cases involving similar questions in the different states, but we deem it unnecessary to go into any elaborate review of these authorities, as we think it clear that the statute relied upon conferred no power upon the land commissioner to make the sales involved in the present case.

It is urged by the appellants that, though the court should reach this conclusion, the complainant in the court below, appellee here, cannot raise the question; that such question can only be raised by the state through its proper officer, the attorney-general. In our opinion the deeds are absolutely void for want of authority on the part of the land commissioner to make the sale, and are not merely voidable for failure to conform to some legal requirement as a condition of making the sale. Whenever a deed is void upon its face, it confers no rights and grants no privileges. It is a mere nullity, and can be attacked collaterally. This point we think was settled in the case of *Huber* v. *Freret et al., supra,* where this court said:

"It is true that this is a collateral and not a direct attack on the patent in question, and it is also true that a patent cannot be attacked unless void. *Gastrell* v. *Phillips,* 64 Miss. 473, 1 So. 729. Nevertheless, where the land commissioner had no authority of law to execute the patent, the attack may be made collaterally, 22 R. C. L., p. 342, section 89; *Dixon* v. *Doe ex dem. Porter,* 23 Miss. 84; *Hit-tuk-ho-mi* v. *Watts,* 7 Smedes & M. 363, 45 Am. Dec. 308. The patent here involved comes within the latter principle. It is void. The land commissioner had no authority of law to convey the lot in question. He lacked entirely the power."

We think the complainant had the power and the right in this suit to attack the validity of the conveyances; and his rights were so affected by the proposed improvements. He had the right to prevent injury to his enjoyment of his property, and was not merely one of

many citizens undertaking to exercise a right on behalf of the state, but he was prosecuting the suit for the protection of the enjoyment of his own rights; consequently he had full authority to institute suit to test the legality of the appellants' rights, under such deeds, which might interfere with and damage, in any way, the enjoyment of his property and property rights. We think the chancellor was warranted in granting the relief afforded.

It is not necessary to discuss the other questions raised in the brief of appellants. The judgment of the court below, therefore, will be affirmed.

*Affirmed.*