609 So.2d 367 (1992)
MISSISSIPPI STATE HIGHWAY COMMISSION
v.
Andrew GILICH, Sr. and Jacobina Gilich.
No. 07-CC-59605.
Supreme Court of Mississippi.
August 5, 1992.
Rehearing Denied December 17, 1992.
*368 Hugh D. Keating, Dukes Dukes Keating & Faneca, Gulfport, for appellant.
James K. Wetzel, Wendy Allard, Gulfport, for appellee.
Michael C. Moore, Atty. Gen., Wilson H. Carroll, Sp. Asst. Atty. Gen., James O. Nelson, II, Jackson, Betsy E. Walker, Virgil G. Gillespie, Gerald H. Blessey, Gillespie & Blessey, Biloxi, for amicus curiae.
Before HAWKINS, P.J., and SULLIVAN and BANKS, JJ.
BANKS, Justice, for the Court:

I
Here we are asked to determine ownership interests in a portion of what was once billed as the "longest man-made beach in the world." Inverse condemnation[1] is at issue in this litigation wherein the Mississippi State Highway Commission (Commission or defendant) appeals an adverse judgment of the Harrison County Circuit Court in favor of Andrew M. Gilich, Sr. and Jacobina Sekul Gilich (Giliches or plaintiffs) for damages resulting from the taking and damaging of their property by virtue of the construction of the Interstate 10 (I-10) interchange with U.S. Highway 90. Finding error, we reverse.

II
The proceedings leading to this Court began on November 4, 1986, when the Giliches filed a complaint against the Commission, alleging that they owned and possessed Lot 20 of Gulf View Property.[2] As *369 described in the deed, the Gilich property was located north of Highway 90 and extended to the water's edge of the Gulf of Mexico. The plaintiffs claimed that in 1984 and 1985, the Commission proposed and began building a project known as the "I-110 loop," which was to run south from the I-10 corridor, loop over the Gulf of Mexico, and connect I-10 with the Highway 90 System in Biloxi, Mississippi. They contended that the southernmost part of their property, which was comprised mainly of a sand beach that extended to the water's edge, was taken by the Commission without compensation in contravention of Miss. Code Ann. § 43-37-1 et seq. (Supp. 1991),[3] and Section 17 of the Mississippi Constitution of 1890.[4] In addition, the Giliches alleged that the building of the loop resulted in a wrongful taking of their riparian and littoral rights.[5]
They claimed that the property north of the highway, though not physically taken, suffered damages from the raising of the loop. Specifically, the view from the property which housed an apartment building was obstructed and access to the beach from the property, adversely affected. These two things combined, they contend, diminished the value of the property.
The Commission took the position that the sand beach lying south of the highway was land held in public trust and that the taking of littoral rights was non-compensable. It denied that the plaintiffs were entitled to any damages, claiming instead that the Giliches do not enjoy any rights to the property south of the highway separate and distinct from the rights of the public.
Prior to trial, the Commission filed a "Motion in Limine" seeking to exclude evidence relating to damages allegedly resulting from loss of view due to construction of the loop "on any property which did not include or abut the property owned by the plaintiffs." The court denied the motion.
Trial ensued and the jury returned a verdict favorable to the Giliches awarding them $35,000.00 in compensatory damages. In addition, the court ordered that the Commission pay attorneys fees and the expenses in the amount of $18,510.97. Final judgment awarding $53,510.97 to the Giliches was entered on February 26, 1988. The Commission filed the usual post-trial motions. This appeal was taken after the motions were overruled.

III
Testimony during trial established that Andrew Gilich (Andrew) and his wife, Jacobina Gilich (Jacobina), owned and operated the Imperial Terrace Apartment Complex located at the corner of Seal Avenue and Highway 90 in Biloxi, Mississippi. At the time of trial, all of the apartments, save one, were occupied and rented for $250.00 a month.[6]
Jacobina, purchased the land on which the complex was located on July 5, 1945, described as follows:
Lot 20 of the Gulf View Property, as per plat thereof on file in Book 2, Page 11 of *370 the Record of Plats in the Office of the Chancery Clerk of Harrison County, Mississippi; except the North 70 feet thereof. Said Property being bounded on the North by property formerly of Smyly, on the East by Seal Avenue, on the South by the Gulf of Mexico, on the West by the property formerly of White; being the same property conveyed to C.L. Smallwood by Wilber R. Dove and wife, by warranty deed dated January 6, 1930, recorded in Book 184, Page 345 of the Deed Records of Harrison C County, Mississippi.
On September 8, 1964, she deeded the property to herself and Andrew, jointly.
He testified he understood the deed description to mean that he owned the property south of Highway 90. The first time he was told that he did not own the property south of the highway was when he sued the Commission. He testified that he paid taxes on the south side of the property and had not been notified by anyone from the tax assessor's office or the city of Biloxi that the taxes he paid did not include the property south of Highway 90. Andrew stated that he and Jacobina gave their tenants permission to use the sand beach portion of the property. He and his wife also personally enjoyed the beach and at one time considered building a pier.
Andrew recalled that in 1952, Harrison County authorized the pumping of sand on the property south of the highway. He could not locate with certainty the waters edge prior to that time. Jacobina later testified that she did not know who pumped in the sand to make the beach but that someone did. No one from the county asked his permission to pump the sand. In the following year, he and Jacobina gave a right-of-way easement to the state highway department for that part of Lot 20 which lay south of the north-edge of the sidewalk. The department paid two dollars for the easement.
Prior to construction of the loop, no person or group came to Mr. Gilich about this particular plan and asked him about buying a right-of-way or easement to go across the sand beach portion of his property or purchasing his riparian rights. He was never asked by any person or group to use the beach property in front of his complex; neither was he compensated for such use.
Andrew did not attend any hearings proposed by the Commission or any other group on behalf of the Commission. He and his wife, however, conveyed their objections to the construction to their city councilman.
Andrew personally observed the construction of the loop from the apartment complex. When the loop was constructed, the contractors removed part of the seawall that separated the beach from the highway and replaced it with a retainer wall, thirty-two inches high from ground level. Andrew stated that if he walked due south of the apartment complex, to the retainer wall he would have to walk 600 feet down the wall before he could get to the sand without scaling the wall. Before the loop, there was no such obstruction. According to Andrew, prior to construction of the loop, each of the apartments had an angled view of the water; now the view from the apartments has been obstructed by the loop.
Jim Wetzel, Sr., tax assessor for Harrison County and son of the plaintiffs and father of their lawyer testified that he had been tax assessor for sixteen years. In that capacity, he kept true values of the property located in the county. He explained to the jury that he determined that an individual owning property fronting Highway 90 owned littoral rights by reading the deeds.
Wetzel was asked to express an opinion of the true value of the sand beach portion of the property based upon his education and experience in the field of appraising land. Counsel objected on the ground that the proper predicate for this type of testimony had not been established. Wetzel had not been offered as or qualified as an expert on land values. The court overruled the objection and allowed Wetzel to testify as an expert based upon his training and his experience in the field of appraisals. Wetzel stated that the beach property was *371 worth $45,000.00 based on $500 to $600 per foot for a total of 75 square feet.
Wetzel stated that he had personally observed and inspected the loop and the barrier rail. The barrier wall prohibits the Giliches and their tenants from gaining direct access to the beach property. Wetzel testified that the Giliches and their renters would have to walk "almost two city blocks before [they] could get around that socalled barrier." Based upon his personal observations, education and experience in the field of real estate appraisals, Wetzel stated that the property south of the highway had a present value substantially less than its true value of $45,000.00 before construction. He stated,
I would say that there is no value left on that property as of the 1st of January of 1988 due to the fact that you have a highway there now. It's non-accessible.
Out of the jury's presence, defense counsel made the following objection:
Comes now the Mississippi State Highway Commission and moves this Court on motion ore tenus to exclude the testimony of Jim Wetzel, Sr. related in any part to real estate values of the subject property or the property south of U.S. Highway 90 for the reason that the witness has failed in his testimony to provide adequate basis for his opinion of value. Particularly, counsel for the plaintiff did not tender the witness as an expert in real estate and I did not stipulate to him being allowed to testify as an expert on real estate values.
* * * * * *
In his measure of damages he did not use the proper approach as the before and after rule. He did not value the whole property before the alleged taking and then the whole property after the alleged taking. He did not give us a total value of the property prior to the alleged taking and that value he gave us after was strictly related to the area south of Highway 90. And I feel like he has failed to comply with the common law of the State of Mississippi brought down by the Supreme Court concerning the before and after rule.
(emphasis added) Plaintiff's counsel responded to the objection by stating that Wetzel was not introduced as a Rule 702 witness but instead as a Rule 701 witness who, in the view of counsel, was capable of testifying and giving lay opinions based upon education and experience.
The court overruled defense counsel's motion to strike the testimony of Mr. Wetzel. The testimony was allowed to stand on the basis of Rule 701. Defense counsel then asked the court to instruct the jury to not consider Wetzel's testimony as expert. The court refused this request.
Referring to a "property record card" given to the assessor's office by an appraisal company under contract with the board of supervisors concerning the portion of the property north of the highway, Wetzel stated that the building was valued at $150,190.00 and the land, $110,360.00, for a total value of $260,550.00.
Wetzel's testimony was that the property on both sides of the highway had been damaged as a result of the construction of the loop and it did not have the value that it once had. He stated that this diminution in value occurred because "access to the water [was] no longer available and also the influx of much expected traffic that's going to be there in front of the property limiting the access to the property as a result of that loop" and the view from the property was obstructed.
Roger Poulos (Poulos) was tendered and qualified as an expert in the fields of commercial and residential real estate appraising. He valued the entire property at $383,000.00 prior to construction and $316,000.00 after. He stated that the south side of the highway was no longer of any use and that, together with the loss of view sustained by the north property, constituted the diminution in value.
Out of the jury's presence, the Commission sought to exclude the testimony of Poulos on the ground that he considered injuries that were general to the public, and he failed to substantiate his opinion and present the comparable sales on which he relied. The court overruled the motion. *372 The Commission did not cross-examine Poulos.
The plaintiffs rested after the testimony of Jacobina Gilich. The defense renewed its motion in limine and its motions to exclude the testimony of Poulos and Wetzel. All motions were denied.
The defense began its case by calling John Slaughter, a right-of-way agent with the highway department. Slaughter abstracted the property known as Lot 20 to show the chain of record title between various transfers of the property. The most significant aspect of his testimony was that there was a break in the chain of title circa 1930 where the record showed a deed from a Wilbur Dove and wife but no deed or other instrument vesting title in Wilbur from Nellie Dove. During cross-examination, Slaughter testified that all the deeds stated that the property in question was bordered on the south by the Gulf of Mexico.
The Commission attempted to elicit testimony from Rick Turner, an engineer with the highway department. The Giliches objected on the ground that the Commission had not complied with the rules of civil procedure as they related to the discovery of expert witnesses and the court ordered discovery deadline. The court sustained the plaintiff's objection and prohibited Turner from testifying as an expert witness. The Commission then offered to call him as a fact witness to get in certain commission documents reflecting the plans for the 1953 construction of the beach showing that the water line came to the highway. Expressing the view that such a procedure would circumvent the court's ruling permission to call Turner as a fact witness was denied.
Mike Pritchard, a real-estate appraiser with the commission, using the cost approach in estimating the fair market value of the apartment complex found that littoral rights added nothing to the market value of property based on a comparison of sales of properties with and without such rights. He also found that the income from the Gilich property increased after construction of the loop. Pritchard stated that the value of the property before construction, utilizing the income approach, was $208,000.00; after construction, $242,500.00. He opined that there was no lost value due to the alleged taking of riparian rights or loss of view, because the comparable rentals revealed that beach-view property rents for the same as non-beach view. He concluded by stating that the daily traffic counts affect all, so that traffic projection did not have an impact on the property.
Houston Evans, an independent real-estate appraiser employed by the Commission to appraise the Gilich property, also concluded that there was no diminution in value as a result of the construction of the safety median/barrier or access to riparian rights.
At the conclusion of Evans' testimony, the case went to the jury which returned a verdict in favor of the Giliches and awarded $35,000.00 "for interference with direct access to their property." The verdict was conformed to a general verdict and judgment entered.
Aggrieved, the Commission appeals to this Court.

IV
The Commission and the Attorney General, as amicus curiae, contend that as a matter of law, the sand beach south of the Gilich property is a public beach held in trust by the State. In support of this argument, the defendants rely upon numerous authorities.
Section 65-33-1 of the Code, and subsequent parts, are cited for the proposition that the boards of supervisors have jurisdiction over the sand beach. Pursuant to the statutes, the supervisors have the power and duty to erect and maintain sea walls, shore stabilization structures, pumped-in sand or earth fills, sloping beaches or other necessary devices to protect and preserve roads, streets, and highways. See Miss. Code Ann. § 65-33-1 (1972). Additionally, they are given the power and authority "to meet and do and grant any request of the United States Beach Erosion Board of the United States *373 Army Engineers" to "assure maintenance of the seawall" and "beach by artificial replenishment" and "assume perpetual ownership of any beach construction and its administration for public use only." See generally Miss. Code Ann. § 65-33-51(2). The Commission also relies upon United States of America v. Harrison County, Mississippi, 399 F.2d 485 (5th Cir.1968) and Cinque Bambini Partnership v. State, 491 So.2d 508 (Miss. 1986) for the proposition held that lands south of Highway 90 are public trust lands. Section 95 of the Mississippi Constitution of 1890 is cited for its prohibition against the grant of public trust lands.
Espousing a position contrary to the Commission and amicus, the Giliches contend that the property south of the highway is owned by them pursuant to this Court's holding in Harrison County v. Guice, 244 Miss. 95, 140 So.2d 838 (1962); thus, they are entitled to compensation for damage done by the Commission. The Commission and amicus curiae ask that we revisit and overrule the decision in Guice.
Crucial to the determination of the issues presented herein is the historical context from which the questions arise. Simultaneous with its admission to the Union in 1817, Mississippi received from the federal government certain lands which were to be held in trust for the public benefit. Part of the public trust included title to all land under tide waters. Cinque Bambini Partnership, 491 So.2d at 514 ("[A]s a matter of federal law, the United States granted to this State in 1817 all lands subject to the ebb and flow of the tide and up to the then mean high water level, without regard to navigability.") As part of the trust, Mississippi was granted "certain tidelands fronting the Gulf of Mexico, extending inland up to the 1817 mean high water mark." Id.
History further informs that parallel to the sand beaches of the Mississippi Sound on the Gulf Coast, a public road[7] extended east and west. In 1909, a severe hurricane washed away long sections the road. It was rebuilt only to be damaged in similar fashion some six years later by another hurricane. In response to inadequate protection, the state legislature passed an Act, Chapter 319, Laws of 1924, the predecessor to Miss. Code Ann. § 65-33-1 et seq. (1972), granting to the counties bordering tidewaters the power to erect seawalls or other structures for the protection of public highways extending along the beach or shore of any such body of tidewater. In this same act, the boards of supervisors were empowered to erect and maintain a sloping beach to protect highways. The boards of supervisors also were given the authority to exercise the right of eminent domain. In 1924, owners of property facing Front Street granted to the City of Biloxi the "right to build, operate and maintain [a] roadway and beach protection." The Giliches predecessors in title allowed an easement "over and across [Lot 20] beach frontage of seventy-four (74) feet situated between Benachi Avenue and Seal Avenue in the City of Biloxi." The easement was granted subject to certain stipulations and restrictions. In particular, all riparian rights were retained and the City of Biloxi received no interest in the land, other than the right to use the easement for roadway and protection purposes.
Notwithstanding this language in the easement, it is probable that Harrison County acquired title to the land by adverse possession. Henritzy v. Harrison County, 180 Miss. 675, 178 So. 322 (1938). In Henritzy, this Court held that Chapter 319 of the Laws of 1924 complied with the Mississippi Constitution and that title to this fifty-foot seawall right-of-way had vested in Harrison County by virtue of the ten year statute of limitation. "This included all the elements of the right-of-way ownership as authorized by the statute, including the right to construct sand beaches at any future time." Harrison County, Mississippi, 399 F.2d at 488.
Harrison County, as part of its ownership rights in the seawall, was given exclusive authority to construct sand beaches, thereby placing such beaches under its dominion *374 and control such that title rested in that governmental unit exclusively. Id.
After the construction of the sea wall, "the incessant action of the waves washed away the sand to the south of these artificial barriers." Harrison County, Mississippi, 399 F.2d at 488. "Such beaches as existed south of the seawall disappeared" and "[t]he land formerly occupied went under the water bottoms of the Mississippi Sound and became the property of the State, in trust for the people." Id. at 488.
The legal result may best be described by quoting the language of the Supreme Court of Mississippi in Parks v. Simpson, 242 Miss. 894, 137 So.2d 136 (1962), as follows:
"This Court, by an unbroken line of decisions over 100 years, has declared that the State `is the owner of lands in the beds of all its shores, inlets, and adjacent to the islands, over which the tides of the sera ebb and flow, and that it holds title as trustee for the people of the State'. Giles v. City of Biloxi, 237 Miss. 65, 112 So.2d 815, 823, 113 So.2d 544; Xidis v. City of Gulfport, 221 Miss. 79, 72 So.2d 153; Crary v. State Highway Commission, 219 Miss. 284, 68 So.2d 468; State ex rel. Rice v. Stewart, 184 Miss. 202, 184 So. 44, 185 So. 247; Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291; Money v. Wood, 152 Miss. 17, 118 So. 357; Martin v. O'Brien, 34 Miss. 21."
Id.
"Where the forces of nature  gradually and imperceptibly  have operated to expand or enlarge the inland reach of the ebb and flow of the tide, the new tidelands so affected accrete to the trust." Id. at 520. See also, City of Corpus Christi v. Davis, 622 S.W.2d 640, 644 (Tex. App. 1981). ("In general, it is said that a riparian or littoral owner loses title to land gradually or imperceptibly taken from his shore.")
Once held by the state in trust, properties are committed to the public purpose and may be alienated from the state only upon the authority of legislative enactment and then only consistent with the public purposes of the trust. Moreover, in Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291 (1933), we held that the federal grant in trust includes "title to all land under tidewater, including the spaces between ordinary high and low water marks.
Section 95 of the Mississippi Constitution of 1890 provides that "[l]ands belonging to, or under the control of the state, shall never be donated directly or indirectly to private corporations or individuals." Id. The language is plain and unequivocal rendering discussion unnecessary. Suffice it to say that once the state possesses public trust lands it is deemed to possess such property forever.
Applying these principles to the case at bar leads us to conclude that unless they can establish that there continuously existed a sand beach south of the sea wall and above the mean high tide prior to the construction of such a beach by Harrison County, the Giliches own no part of the sand beach. We held in Cinque Bambini Partnership that "[t]he public trust, vintage 1817, may be augmented by accretions and by the natural inland expansion of the tidal influence." Cinque Bambini Partnership, 491 So.2d at 519. "[T]hose lands, not tidelands in 1817, which have become such via the natural process of accretion or the general rising or inland expansion of the tide have in law been added to the trust so that title is held by the State." Id. at 520.
In support of their position, the Giliches rely heavily upon this Court's decision in Guice. They argue that overruling Guice would create confusion with regard to all titles along the Mississippi Gulf Coast. Additionally, they contend that the sand beach resulted from an artificial accretion, not affecting their title; thus, Section 95 of the Mississippi Constitution does not apply.
In Guice this court was faced with findings based on substantial evidence that Guice owned lands south of Highway 90 which were never below the mean high tide. There were additional lands which were recovered by the county from below the mean high tide by pumping up sand. It was deemed impossible to ascertain a line *375 of demarcation. This court held that the county had no estate in the lands which always remained above the mean high tide and that the recovered land also accreted to Guice by virtue of the doctrine of artificial accretion. The court reasoned that to rule otherwise would result in allowing the state to take Guice's littoral right of direct access without compensation. Id. 140 So.2d at 842.
In Harrison County, the Fifth Circuit called the latter holding into question. Addressing the holding in Guice the court observed that,
[b]y application of the common law doctrine of artificial accretion the private landowners were denominated the donees of land which unquestionably belonged to the State when the improvements began. We are of the view that under the facts of this case this cannot be squared with Section 95 of the Mississippi Constitution of 1890. That section reads as follows:
"lands belonging to, or under the control of the state, shall never be donated directly or indirectly [emphasis added] to private corporations or individuals."
We assume that this provision was not called to the attention of the Supreme Court of Mississippi, as it is not discussed in the opinion. In any event the constitutional provisions supercedes and abrogates the common law, 15A C.J.S. Common Law §§ 11 and 12.
* * * * * *
The common law doctrine of artificial accretion must yield to the command of the Mississippi Constitutions to the disposition of state owned lands.
Id. 399 F.2d at 491.
We agree. On the basis of Section 95 of the Mississippi Constitution we hereby overrule Guice insofar as it applies the doctrine of artificial accretion so as to render lands once a part of the public trust, the property of private land owners by the action of the government in artificially recovering such lands.
Nothing in this record establishes that the Giliches owned lands south of Highway 90 and north of the mean high tide. Indeed, the record is bereft of any attempt to establish the line of the mean high tide at any time. Gilich cannot claim compensation for that which is not owned by them. State Highway Commission v. McDonalds Corp., 509 So.2d 856 (Miss. 1987).
The jury was instructed peremptorily on the question of ownership of the sand beach. In light of our disavowal of Guice this matter must be tried anew. According to the evidence in the record, the only portion of the loop that is located on property alleged to be owned by the Giliches is forty feet south of the original seawall. If that property is held in trust by the state for the public use, the Giliches are not entitled to compensation for this encroachment.

VI
Riparian/littoral rights are codified in Miss. Code Ann. § 49-15-9 (1972). These rights include the right to plant and gather oysters, construct bath houses, piers, and other structures in front of any land bordering on the Gulf of Mexico or Mississippi Sound.
This Court has held that these rights are not property rights, per se; instead they are mere licenses or privileges. Catchot v. Zeigler, 92 Miss. 191, 45 So. 707 (1908). Furthermore, these licenses are revocable. Crary v. State Highway Commission, 219 Miss. 284, 68 So.2d 468 (1953). And where such privileges are revoked for the greater public good, in the exercise of the state's police power, the abutting property owners have no claim for damages under Section 17 of the Constitution. Crary, 68 So.2d at 471. As the amicus writes, where the State has exercised its power to impose an additional public use on property already set aside for public purpose, the injury to riparian or littoral licenses is not a taking of private property for which compensation must be made.
Furthermore, any littoral rights due the Giliches have been untouched by the construction because the shoreline has not been touched. They still have the rights, *376 pursuant to statute, to plant and gather oysters and construct any beach structures they so desire. We hold that the Giliches are not entitled to compensation for any loss of littoral rights.

VII
The Giliches asserted that the whole of their property was damaged by the construction of the loop. Their demand for compensation was premised upon Section 17 or the Mississippi State Constitution of 1890. That section provides, in parts relevant to the present discussion,
Private property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law.
Miss. Const., art. 3, section 17 (1890) (Emphasis supplied).
The jury returned a verdict in favor of the Giliches in the amount of $35,000.00 "for interferences of direct access to" the property owned by the Giliches. To the extent that the verdict is premised on the fact that the Giliches owned the sand beach, it must be reversed. The question remains whether the Giliches are entitled to damages, if any, sustained to the property north of Highway 90 by virtue of interference with access, light, air, and view.
We indicated in the companion case brought by one of the Giliches sons who owned the land across Seal Avenue from them, "a property right in light, air, and view vests in one who owns property abutting a street or highway." See Gilich v. State Highway Com'n, 574 So.2d 8, 12 (Miss. 1990). The easement across streets runs only to property abutting the street and is limited to the view over the street. Id. at 13.
Additionally, noise attributable to increased traffic and the proximity of the highway to a residence may be considered only insofar as it impairs the fair market value of the property remaining after the taking. "The before and after rule `swallows and absorbs' all specific elements of damages." State Highway Com'n v. Havard, 508 So.2d 1099, 1101 (Miss. 1987).
The record is replete with evidence from both plaintiff and defense witnesses testifying to the damage to the property. Specifically, Andrew Gilich, Sr., Poulos, and Wetzel fixed the amount of compensation due between $65,000.00 and $67,000.00 on the property north of the highway. Such testimony took into account view, access, inconvenience. In Havard, it was held that witnesses may be questioned concerning the impact of the taking on the property. "[W]itnesses may testify concerning any specific quality, item or change in the property or its attributes, so long as this is ultimately related to the value of the property remaining after the taking." Id. at 1101-02. Furthermore, given that the property was residential, the questions of noise and proximity of the highway were relevant. Id.
Contrary to the assertion by Gilich, the aesthetic value of the property, in and of itself, is not compensable. Miss. State Highway Com'n v. Viverette, 529 So.2d 896, 900 (Miss. 1988). "Aesthetics enter into an eminent domain proceeding only insofar as they affect the fair market value of property... ." Id.
Witnesses called by the Commission who maintained that the Gilich apartment complex, despite construction of the loop, continued to be valuable property. In fact, the experts testifying on behalf of the Commission stated the apartment complex was actually more valuable after the addition of the loop.
The Commission claims that the court abused its discretion by failing to exclude the evidence related to damages resulting from loss of view from the property north of Highway 90 due to construction of the loop on the sand beach based on its contention that the loop was not on or abutting the property owned by the Giliches.
Both parties cite Collins v. Mississippi State Highway Commission, 102 So.2d 678 (Miss. 1958) in support of their arguments. The Commission claims that the Giliches, like the plaintiff in Collins, can receive no *377 compensation for loss of view because the loop was not constructed on their property or on property abutting property owned by them.
To the Giliches, Collins stands for the proposition that landowners have an easement of light, air, access and view in abutting street or highway. Since the loop abuts and in fact encroaches approximately 40 feet on the property south of the highway, they are entitled to compensation.
The tidelands held in public trust are as public highways. Crary v. State Highway Commission, 219 Miss. 284, 68 So.2d 468, 471 (1953). To the extent that the Giliches can show diminution in value from loss of view or access due to alteration of the use of that land, they are entitled to compensation.

VIII
A number of errors regarding discovery violations and use of witnesses as experts are claimed. The discovery violations should not recur. We trust that counsel and the trial court have had sufficient experience with our rules of evidence, particularly, Rule 701 of the rules of evidence, that the apparent misunderstandings regarding their import will not recur. Mississippi Rule of Evidence 701 provides,
If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of his testimony or the determination of a fact in issue.
Miss.R.Evid. 701.
Rule 701 opinions are by definition lay opinions and thus require no specialized knowledge, however obtained. Wetzel's testimony was clearly expert, and not lay opinion, testimony. Thus, he should not have been permitted to testify as a Rule 701 witness. In the context of a criminal case, we have had occasion to discuss the difference between Rules 701 and 702. In Goodson v. State, 566 So.2d 1142 (Miss. 1990), we explained that while there are occasions when a person who by profession possesses expertise may offer a lay opinion, this is not so where the witness is proceeding in his professional capacity. In other words, where a witness is to give testimony derived from specialized knowledge gained by education or experience, the testimony is not lay opinion testimony. Here it is abundantly clear that the opinions solicited from Wetzel were to be derived from his education and experience. Indeed, the court said so. His testimony was admissible, if at all, pursuant to Rule 702.

CONCLUSION
For the foregoing reasons, the judgment below is reversed and this matter is remanded to the circuit court of Harrison County for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, PITTMAN and McRAE, JJ., concur.
DAN M. LEE, P.J., dissents.
NOTES
[1] Inverse Condemnation is "a cause of action against a government agency to recover the value of property taken by the agency, though no formal exercise of the power of eminent domain has been completed."

Black's Law Dictionary 740 (5th. ed. 1979).
[2] In the early 1900's, the developers of Gulf View Property, John Carraway and L. Lopez, Jr., conveyed Lot 20 to Mary Evans Maben by warranty deed. The Lot was described as

bounded north by Lot 17, south by the Gulf of Mexico, east by a street, and west by Lot 19, having a front on the south 74 feet, more or less, and extending back north between parallel lines as follows, to-wit: On the east 272 feet, 4 inches and 6 lines, and on the west 267 feet, 5 inches and 2 lines, together with all and singular the rights, privileges and appurtenances thereunto belonging.
[3] The Real Property Acquisition Policies Act.
[4] That section provides,

[P]rivate Property shall not be taken or damaged for public use, except on due compensation being first made to the and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be a judicial question, and, as such, determined without regard to legislative assertion that the use is public.
[5] Riparian rights are the rights which every person, through whose land a natural watercourse runs, has to benefit of a stream as it passes through his land for all useful purposes to which it may be applied. Black's Law Dictionary 1192 (5th ed. 1979).

Littoral rights are those "rights concerning properties abutting an ocean, sea or lake rather than a river or stream (riparian)"; they are usually concerned with the use and enjoyment of the shore. Id. at 842.
[6] One of the tenants paid $185.00 per month because he had rented from the Giliches since 1964.
[7] In 1900, this road was called Front Street; it is now known as Highway 90.